IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, EASTERN DIVISION

```
CONNIE YELVERTON, as            )
Administratrix of the           )
Estate of Charles Keith         )
McConnell, deceased,            )
                                )
     Plaintiff,                 )
                                )   CIVIL ACTION NO.
     v.                         )      3:04cv556-T
                                )         (WO)
MICHAEL E. VARGO, etc.,         )
et al.,                         )
                                )
     Defendants.                )

BARBARA BROWN, as               )
Administratrix of the           )
Estate of Amanda Taylor,        )
deceased,                       )
                                )
     Plaintiff,                 )
                                )   CIVIL ACTION NO.
     v.                         )      3:04cv562-T
                                )         (WO)
MICHAEL E. VARGO, etc.,         )
et al.,                         )
                                )
     Defendants.                )
```

OPINION

Plaintiffs Connie Yelverton (as administratrix for the estate of Charles Keith McConnell) and Barbara Brown (as administratrix for the estate of Amanda Taylor) brought this lawsuit against defendants Michael E. Vargo, Christopher R. Brennan, and Patrick H. Daughtry, all police officers with Phenix City, Alabama.[1] Yelverton and Brown assert excessive-force claims under the Fourth and Fourteenth Amendments of the United States Constitution, as enforced by 42 U.S.C.A. § 1983.  Additionally, they assert state-law tort claims. Jurisdiction is proper under 28 U.S.C.A. §§ 1331 (federal claims), 1343 (civil rights claims), and 1367 (state claims).

This case is before the court on the police officers' motion for summary judgment.  The court concludes that, first, summary judgment should be granted as to Yelverton and Brown's federal claims and, second, their state-law

---

1. Phenix City and its mayor and police were also defendants but were later dismissed by agreement of all parties.

claims should be dismissed with leave to refile in state court.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).  The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not

rest upon the mere allegations or denials in the pleadings. Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. FACTUAL BACKGROUND

What follows is Yelverton and Brown's version of the facts in this case.

During the early morning hours of June 8, 2002, the Phenix City Police Department received a call reporting a disturbance at Charlie's Bar and Grille. When Officers Daughtry and Brennan arrived, they attempted to stop several

fights that were going on in the bar's parking lot.[2] As one of the patrons, Charles Keith McConnell, jumped into his pickup truck, a bystander yelled in his direction, "there he is; get him; he did it."[3] Officer Daughtry directed Officer Vargo, who was near McConnell and had just arrived on the scene, to stop the truck.[4] Vargo yelled to McConnell to stop but McConnell refused. After stopping and starting and swerving his truck, McConnell nearly hit Vargo and others as he drove out of the lot.[5]

Because Daughtry had directed that McConnell be stopped and because McConnell was driving recklessly, Vargo sprayed McConnell in the face with a can of "Freeze + P OC" spray, commonly known as pepper spray, in order to stop him.[6]

---

  2. Plaintiffs' response (Doc. No. 41), Excerpts from Deposition of Sergeant Daughtry, Ex. 15, at pp. 28-32.

  3. Id. at pp. 25-26.

  4. Id. Excerpts from deposition of Vargo, Ex. 14, at pp. 33-34.

  5. Id. at p. 42.

  6. Plaintiffs' response (Doc. No. 41), Excerpts from deposition of Vargo, Ex. 14, at pp. 36-37.

5

McConnell threw up his left arm over his face[7] and then rammed into Vargo's unmarked car as he left with Taylor in the bed of the truck.[8]

Vargo (in his unmarked car with neither his siren nor his emergency lights on) followed by Brennan (in his marked car with his emergency lights and siren on) set out in search of McConnell. McConnell had traveled only 1.1 miles[9] when Vargo and Brennan located him.[10] Although McConnell "was _not_ traveling fast," Vargo "stayed back a little" because McConnell was driving "erratically"; McConnell was "swerving left to right as though [he] could not control the vehicle."[11] When Vargo moved to the side to let Brennan come around, McConnell's truck left the road,[12] struck two

---

7. _Id_. at p. 48.

8. Defendants' brief (Doc. No. 27), Ex. 1A.

9. Stipulation (Doc. No. 43).

10. Defendants' brief (Doc. No. 27), Ex. 1A.

11. _Id_. (emphasis added).

12. Plaintiffs' response (Doc. No. 41), Excerpts from deposition of Vargo, Ex. 14, at p. 57.

telephone poles, and overturned.  McConnell and Taylor where killed.[13]

Throughout the incident, Officer Vargo, unlike Officers Daughtry and Brennan, was not in uniform;[14] nor did he identify himself as a police officer to McConnell and Taylor.[15]

### III.  FEDERAL CLAIMS

Yelverton and Brown allege that the officers used excessive force on two separate occasions the night McConnell and Taylor were killed: (1) when Vargo sprayed McConnell with pepper spray and (2) when Vargo and Brennan chased McConnell and Taylor in the pickup truck.

---

13. Plaintiffs' complaint (Doc. No. 1), at 3, and defendants' answer (Doc. No. 7), at 3.

14. Plaintiffs' response (Doc. No. 41), Excerpts from deposition of Vargo, Ex. 14, at pp. 28-32.

15. Id. at pp. 111-114.

### A.  Excessive Force : Pepper Spray

The first line of inquiry in analyzing an excessive-force claim is to identify the specific constitutional right allegedly infringed by the challenged application of force. Graham v. Connor, 490 U.S. 386, 394 (1989).  In this case, Yelverton and Brown rely on the Fourth and Fourteenth Amendments as the constitutional basis for their excessive-force claim.

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." Albright v. Oliver, 510 U.S. 266, 273 (1994) (quoting Graham, 490 U.S. at 395).  "[A]ll claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a

'substantive due process' approach. Graham, 490 U.S. at 395.

Officer Vargo's pepper spraying of McConnell constituted a seizure even though it did not stop him. See California v. Hodari D., 499 U.S. 621, 626 (1991) ("application of physical force to restrain movement, even when it is ultimately unsuccessful" is sufficient to constitute a seizure); Vaughan v. Cox, 343 F.3d 1323, 1329 & n.5 (11th Cir. 2003) ("Because Vaughan was hit by a bullet that was meant to stop him, he was subjected to a Fourth Amendment seizure. ... The fact that Vaughan was not taken into custody immediately following the shooting is immaterial."). Therefore, Yelverton and Brown's excessive-force claim must be governed by the Fourth Amendment rather than by Fourteenth Amendment substantive due process.

The government's right to make an arrest or investigatory stop "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. In analyzing a claim

9

of excessive force during an arrest or investigatory stop, the pivotal question the court must answer "is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397.  When the court assesses the officers' acts, it must be mindful that these actions should be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Id. at 396.  Moreover, the court must allow for the fact that police officers "must often make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation."  Id. at 397.

In evaluating the proper application of the use of force the court must balance several factors.  Specifically, the court looks to the circumstances under which the force was applied, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety

of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.

In this case, when Officer Vargo approached McConnell, Vargo not only suspected that McConnell was involved in a serious crime--a large, violent brawl outside a bar, but he had personally observed McConnell driving so recklessly that he had almost hit Vargo and others on the lot. Because McConnell refused to obey Vargo's request that he stay, the use of some force to stop him from leaving the scene was clearly necessary.

The question then becomes whether the force Officer Vargo used, that is, pepper spray, was reasonable. This court finds instructive two recent Eleventh Circuit cases addressing the use of pepper spray. In Vinyard v. Wilson, 311 F.3d 1340, 1348 (11th Cir. 2002), the Eleventh Circuit Court of Appeals held that "pepper spray is generally of limited intrusiveness, and it is designed to disable a suspect without causing permanent physical injury."

11

(Internal citations and quotations omitted).  Later, in McCormick v. Fort Lauderdale, 333 F.3d 1234, 1245 (11th Cir. 2003), pepper spray was described as "an especially nonevasive weapon" as well as a "very safe."  As detailed above, Officer Vargo reasonably suspected that McConnell had committed a crime, and McConnell refused to stop when ordered not to leave the scene.  Vargo's use of the pepper spray was clearly reasonable.

### B. Excessive Force: The Chase

As explained above, it is first necessary to define with precision the constitutional basis underpinning the claim that a high speed chase amounted to excessive force under § 1983.  "[A] police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment."  County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998).  To effectuate a seizure, the government must do more than desire the termination of an individual's freedom of movement; it must actually bring about "the

termination through *means intentionally applied*." Id. (emphasis in original) (quoting Brower v. County of Inyo, 489 U.S. 593, 597 (1989)). There is no seizure where police officers continue to pursue a fleeing suspect, nor is there a seizure where the government "accidently stop[s] [a] suspect by crashing into him." Id. (quoting Brower, 489 U.S. at 597). In this case, Officers Vargo and Brennan's cars made no contact with McConnell's vehicle. Therefore, pursuant to Lewis, no seizure occurred in this instance. As such, the Fourteenth Amendment, not the Fourth Amendment, is the appropriate constitutional basis for asserting this excessive-force claim.

The substantive component of the Fourteenth Amendment's due process clause provides relief for abuse by executive officials. However, for executive abuse to rise to the level of a constitutional violation, there must be a high degree of government culpability to avoid supplanting traditional tort law remedies. Id. at 848. The Fourteenth Amendment demands that the only type of executive action

13

capable of rising to the level of a constitutional violation is that which "shocks the conscience."  Id. at 846.

In delineating this "shocks the conscience" standard, the Supreme Court has likened high speed car chases to prison riots.  It reasoned that in both instances executive officials have to make critical decisions "in haste, under pressure, and frequently without the luxury of a second chance." Id. at 853 (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)).  Because police officers have to make an almost instantaneous decision in a likely tense and quickly evolving situation, high speed chases "with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment." Id. at 854.

Yelverton and Brown attempt to distinguish Lewis on the grounds that Officers Vargo and Brennan had sufficient time for deliberation in which they could have decided to halt their chase of McConnell.  Admittedly, there is language in Lewis to the effect that there is a possible claim against

14

prison guards for deliberate indifference to inmates' welfare in the narrow circumstances where the guards have the opportunity "to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations" and where "such extended opportunities to do better are teamed with protracted failure to even care." Id. at 853. In this limited situation, such indifference to inmate welfare shocks the conscience. Id.

However, this attempt to distinguish Lewis is unpersuasive because, "[a]s the term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." Id. at 851 (citing Whitley, 475 U.S. at 320). The Court plainly found that high speed police chases were exactly the type of actively were the term deliberate indifference could not be sensibly employed. Furthermore, the Court mandated a finding that the police acted with a harmful purpose or with

15

an intent to worsen the drivers' plight.  Yelverton and Brown have provided no such evidence.

Moreover, there was, in fact, no "high speed chase." McConnell had traveled only a short distance, 1.1 miles, when Vargo and Brennan found him, and the uncontradicted evidence is that McConnell, while driving erratically, was not driving fast.

But more importantly, the real and only cause of the accident was McConnell's reckless decision to drive after he had been pepper sprayed.  See Troupe v. Sarasota County, Fla., ___ F.3d ___, 2005 WL 1813304 (11th Cir. 2005) (suspect's continued flight in car after having been shot by deputy constituted an independent intervening cause of injuries and deaths sustained by passengers, and, therefore, deputies were not the proximate cause of injuries and deaths of passengers during police chase, as required for § 1983 excessive-force claim).

16

## IV. STATE-LAW CLAIMS

28 U.S.C.A. § 1367(c)(3) provides that a "district court may decline to exercise supplemental jurisdiction over a claim if ... the district court has dismissed all claims over which it has original jurisdiction."  Because summary judgment is due to be granted on Yelverton and Brown's federal claims, the court declines to exercise supplemental jurisdiction over their state-law claims.  Accordingly, these claims will be dismissed, albeit without prejudice.  See United Mine Workers of America v. Gibbs, 383 U.S. 715, 726-727 (1966); L.S.T., Inc. v. Crow, 49 F.3d 679, 685 (11th Cir. 1995).  The court's dismissal of this state-law claims should not work to Yelverton and Brown's disadvantage.[16]

---

16. Section 1367(d) provides for at least a 30-day tolling of any applicable statute of limitations so as to allow plaintiffs to refile their claims in state court.  The section states:

> "The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the
> (continued...)

**\*\*\*\***

For the foregoing reasons, the court concludes that summary judgment is due to be granted on Yelverton and Brown's federal claims and that their state-law claims are due to be dismissed without prejudice.

An appropriate judgment will be entered.

DONE, this the 7th day of September, 2005.

                                         /s/ Myron H. Thompson
                                          UNITED STATES DISTRICT JUDGE

---

16. (...continued)
    claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period."